AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Eastern District of Virginia

JAN - 4 2018

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>One Lot of Electronic Devices More Particularly Described<br>in Attachment A, Currently Located at 9325 Discovery<br>Blvd, Manassas, VA 20109 | )<br>)<br>)  Case No. 1:18sw2<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A (incorporated by reference).

located in the _____ Eastern _____ District of _____ Virginia _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252(a)(4)(B) | Possessing material containing visual depictions of minors engaged in sexually explicit conduct |
| 18 U.S.C. § 2252A(a)(5)(B) | Possessing material containing child pornography that affects interstate commerce |

The application is based on these facts:
See attached affidavit of Rachel Bergstrom,  FBI Special Agent.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Rachel Bergstrom,  FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

/s/
_____
Theresa Carroll Buchanan
United States Magistrate Judge

Date:    01/04/2018

*Judge's signature*

City and state: Alexandria, Virginia

Theresa Carroll Buchanan, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

The property to be searched is one lot of electronic devices (the "DEVICES") seized during execution of the search warrant referenced in the complaint, currently located at 9325 Discovery Blvd, Manassas, VA 20109.

List of Electronic Items Seized from the Vehicle
1. Toshiba Laptop and Power Cord, S/N 4F166270C
2. Black and Red Sandisk 256 GB Cruzer Glide (Thumb drive)
3. White Thumb Drive

List of Electronic Items Seized from the Residence
4. SIM Card in Plastic Bag With Unknown Liquid
5. Ultra Mobile SIM Card W/ Serial # 8901260963152788787F
6. One Sony PSP, Barcode PP803364576-PSP 1001
7. Playstation 4 Console (S/N MB725621348) and Cables and Three (3) Sony Wireless Remote Controllers (S/N 15242580512063, 4389691605665, 438911270480)
8. (3) Unmarked DVD-R TDK
9. Playstation 2 Power Cords and One (1) Remote Controller
10. One Black Thumb Drive Case in Plastic Bag
11. Playstation 2 Console with S/N PK135399177; Three (3) Playstation 2 Memory Cards, One with "CF" Marking, One with "AW" Marking, and One Blank
12. One White Toshiba Laptop S/N: 99039178W
13. One Tascam DR-07 Portable Digital Recorder
14. Samsung Tablet Model GT-P6800 S/N-RF1C42STA7T
15. One Black Hard Drive Serial # WX61EC67ZZME
16. 14 Computer Discs
17. Samsung Galaxy Note 3
18. One Black iPod with Two Stickers
19. One Black 30 GB iPod
20. HP Laptop, Silver Colored 5CG73912H3
21. One Black HP Laptop S/N: 2CE3141VFR, Product: C2L4OUA#ABA
22. One Black Toshiba Laptop S/N: Y9190958Q
23. SIM Card
24. One Sony IC Recorder
25. iPhone, Black Color
26. One iPhone With Black Otter Case PW-030240
27. Toshiba USB 2.0 External Hard Drive and Cord
28. 256 MB Sandisk Memory Card
29. San Disk Memory Stick Flash Drive 32 GB Cruzer Glide
30. "1" Samsung Tablet, Black w/ T-Mobile C060 S/N: RF2F701KEVE
31. One Black Hard Drive
32. File System Image of iPhone Item (from "One iPhone with Black Otter Case PW-030240")
33. Physical Image of Samsung Phone (from "Samsung Galaxy Note 3")
34. Nintendo Game Cube, S/N DS311890857; Two (2) Game Cube Remote Controllers, One (1) Game Cube Memory Card and Cables

1

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

All information that constitutes fruits, evidence and instrumentalities of violations of 18

U.S.C. §§ 2252 and 2252A ("SUBJECT FILES") including, without limitation, information

pertaining to the following matters:

   a. Child pornography and child erotica;

   b. Evidence of who uploaded, owned, controlled, or otherwise used the SUBJECT
      FILES;

   c. Evidence of when, and under what circumstances the SUBJECT FILES were
      uploaded, downloaded, created, modified, deleted, accessed, or shared;

   d. Evidence relating to the mental state of the uploader of the SUBJECT FILES as it
      relates to the crimes under investigation.

   e. Stored photographs, videos or any images of minors engaged in sexually
      explicit conduct;

   f. Any hidden, deleted or erased data, communications, photographs or graphic
      images, multimedia items or documents found in the DEVICES which
      constitute evidence of the offenses listed above;

   g. Stored electronic mail, including attachments, MMS messages, and voice
      messages and other recordings which may pertain to sexual conduct with
      minors or attempts to meet with minors;

   h. Evidence of who used, owned, or controlled the DEVICES at the time the
      things described in this warrant were created, received, edited, or deleted, such
      as logs, registry entries, configuration files, saved usernames and passwords,
      documents, browsing history, user profiles, email, email contacts, "chat,"
      instant messaging logs, photographs, and correspondence;

   i. Evidence of the times the DEVICES were used;

   j. Passwords, encryption keys, and other access devices that may be necessary to
      access the DEVICES;

2

k.  Contextual information necessary to understand the evidence described in this attachment;

l.  Records of internet activity, including but not limited to caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

IN RE SEARCH OF:

ONE LOT OF ELECTRONIC DEVICES
MORE PARTICULARLY DESCRIBED IN
ATTACHMENT A, CURRENTLY
LOCATED AT 9325 DISCOVERY BLVD,
MANASSAS, VA 20109

Case No. 1:18-sw-2

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT

I, Special Agent Rachel Bergstrom, being duly sworn, depose and state as follows:

### INTRODUCTION

1.      I am a Special Agent of the Federal Bureau of Investigation (hereinafter FBI),
assigned to the Washington Field Office, Joint Terrorism Task Force (JTTF).  I have been an FBI
Special Agent since 2016. As part of my duties, I investigate terrorist activities associated with
Homegrown Violent Extremists (HVE).  I have participated in numerous counterterrorism
investigations, during the course of which I have conducted physical surveillance, executed court
authorized search warrants, and used other investigative techniques to secure relevant
information regarding various crimes.

2.      I am familiar with the complaint affidavit for *United States of America v. Sean
Andrew Duncan* (1:17-mj-621) ("the complaint"), and I know all the information in it to be true
and accurate. I hereby incorporate and adopt that affidavit, as set forth in Attachment C.
However, in paragraph 22, where it stated that the Allegheny County Police Department (ACPD)
provided the FBI with a copy of Duncan's phone on June 29, 2017, I now clarify that ACPD

1

provided the FBI with a partial copy of Duncan's phone on that date, and the remainder of the copy on October 6, 2017.

3.      I submit this affidavit in support of an application to search one lot of electronic devices (the "DEVICES") more particularly described in Attachment A and currently located in the Eastern District of Virginia, and to seize the items more particularly described in Attachment B, which constitute instrumentalities, fruits, contraband, and evidence of violations of Title 18, United States Code, Sections 2252 and 2252A.

4.      On December 29, 2017 and again on January 1, 2018, while reviewing one of the electronic devices  obtained as a result of the search warrant referenced in the complaint for evidence pertaining to violations of Title 18, United States Code, Sections 1001 and 2339B, I observed images of what appeared to be child pornography contained within the device.  Based on my training, experience, and the facts set forth below, I submit there is probable cause to believe that the images constitute violations of Title 18, United States Code, Sections 2252 and 2252A.

5.      The statements in this affidavit are based upon information that I obtained during this investigation, either through direct observation, review of evidence or records, or communications with witnesses or fellow law enforcement personnel.   Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that the DEVICES constitute or contain contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2) (possession of and access with intent to view a visual depiction of a

2

minor engaged in sexually explicit conduct); and 2252A(a)(5)(B) and (b)(2) (possession of and

access with intent to view child pornography).

## STATUTORY AUTHORITY

6.      Title 18, United States Code, Section 2252(a)(4)(B) and (b)(2) prohibits the

possession of one or more books, magazines, periodicals, films, or other materials which contain

any visual depictions of minors engaged in sexually explicit conduct that have been transported

using any means or facility of interstate or foreign commerce or in or affecting interstate or

foreign commerce or that were produced using materials that had traveled in interstate or foreign

commerce, by any means, including by computer.

7.      Title 18, United States Code, Section 2252A(a)(5)(B) and (b)(2) prohibits the

knowing possession of any book, magazine, periodical, film, videotape, computer disk, or other

material that contains an image of child pornography that has been mailed, or shipped or

transported using any means or facility of interstate or foreign commerce or in or affecting

interstate or foreign commerce by any means, including by computer, or that was produced using

materials that have been mailed, or shipped or transported in interstate or foreign commerce by

any means, including by computer.

## DEFINITIONS

8.      The following definitions apply to this Affidavit and its Attachments:

a.      "Child erotica," as used herein, means materials or items that are sexually

arousing to persons having a sexual interest in minors but that are not necessarily obscene

or do not necessarily depict minors in sexually explicit poses or positions.

3

b.      "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

c.      "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices.  *See* 18 U.S.C. § 1030(e)(1).

d.      "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

e.      "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

f.      "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

4

g.    "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, THE INTERNET, AND EMAIL

9.    I have had training in the investigation of computer-related crimes and I have consulted more senior law enforcement agents on this matter.  Based on my training and experience, I know the following:

a.    Computers and digital technology have dramatically changed the way in which individuals interested in child pornography interact with each other.  Computers basically serve four functions in connection with child pornography:  production, communication, distribution, and storage.

b.    Child pornographers can now transfer printed photographs into a computer-readable format with a device known as a scanner.  Furthermore, with the advent of digital cameras and smartphones with cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera or smartphone to the computer.  In the last ten years, the resolution of pictures taken by digital cameras and smartphones has increased dramatically, meaning that such pictures have become sharper and crisper.  Photos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone.  These memory cards often store up to 32 gigabytes of data,

5

which provides enough space to store thousands of high-resolution photographs. Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera. The video files can be easily transferred from the camcorder to a computer.

      c.      A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (*i.e.*, "instant messaging"), cloud storage, and easy access to the Internet, the computer is a preferred method of distribution and receipt of child pornographic materials.

      d.      The Internet affords individuals numerous venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

      e.      Individuals also use online resources to trade, distribute, store, and retrieve child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of

computer files in any variety of formats.  A user can set up an online storage account
from any computer with access to the Internet.

## BACKGROUND TO THE INVESTIGATION

24.     On December 29, 2017, while executing the search warrant referenced in the
complaint, the FBI seized one lot of electronic devices, more particularly described in
Attachment A.

25.     One item seized was a Samsung Galaxy Note 3 smartphone. The Samsung Galaxy
Note 3 smartphone was accessed on site during the execution of the search warrant. On
December 29, 2017, and again on January 1, 2018, while reviewing the images within this device
for violations of Title 18, United States Code, Sections 2339B and 1001, I observed images of
pre-pubescent minors that appeared to be engaged in sexually explicit conduct with adult males.
The images appeared to be child pornography.  I observed other images of pre-pubescent minors
posed to expose their genitalia in a sexual manner, which also appeared to be child pornography.
Several of the images appeared to be screen shots of viewed websites. The pre-pubescent minors
in the photos were as young as infants, and the total number of images was in the hundreds.

26.     The Samsung Galaxy Note 3 smartphone containing the images of child
pornography was registered in the past to the same cellular telephone number ending in 7730 that
law enforcement knows to belong to Duncan.

27.     In addition to the Samsung Galaxy Note 3 smartphone, FBI agents recovered a
baggie that Duncan had thrown.  The baggie was a clear plastic Ziploc bag, containing the
memory chip of a thumb drive that had been snapped into pieces and placed in a liquid substance

7

that produced frothy white bubbles. The agents also recovered a broken casing for a thumb drive from Duncan's pants pocket.

28.     Based on my training and experience, I know that thumb drives can be plugged into computers and used to store large gigabyte amounts of electronic information, to include images and documents. Based on my training and experience, I know that criminals often use thumb drives to store evidence of their criminal activity that they do not want found on their computers. Because images, documents, and other information stored on a thumb drive cannot be accessed without first plugging the thumb drive into a computer, I submit that there is probable cause to believe that Duncan used the thumb drive on his home computers.

29.     Because child pornography has already been found on a smartphone, which is a computer, I submit there is probable cause to believe that other electronic devices, including the laptops, tablets, smartphones, and other devices capable of being attached to the internet or storing digital information, have been used to download child pornography and store those images on external storage media.

## CONCLUSION

30.     Based on the information set forth above, I submit there is probable cause to believe the DEVICES, as listed in Attachment A, contain or constitute evidence, fruits, instrumentalities, and/or contraband related to violations of 18 U.S.C. §§ 2252 and 2252A. I

8

therefore request that the Court issue the proposed warrant to search the DEVICES in

Attachment A, and to seize evidence more particularly described in Attachment B.

Rachel M. Bergstrom
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me this 4th day of January, 2018.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

The Hon. Theresa Carroll Buchanan
United States Magistrate Judge

9

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

The property to be searched is one lot of electronic devices (the "DEVICES") seized during execution of the search warrant referenced in the complaint, currently located at 9325 Discovery Blvd, Manassas, VA 20109.

List of Electronic Items Seized from the Vehicle
1. Toshiba Laptop and Power Cord, S/N 4F166270C
2. Black and Red Sandisk 256 GB Cruzer Glide (Thumb drive)
3. White Thumb Drive

List of Electronic Items Seized from the Residence
4. SIM Card in Plastic Bag With Unknown Liquid
5. Ultra Mobile SIM Card W/ Serial # 8901260963152788787F
6. One Sony PSP, Barcode PP803364576-PSP 1001
7. Playstation 4 Console (S/N MB725621348) and Cables and Three (3) Sony Wireless Remote Controllers (S/N 15242580512063, 4389691605665, 438911270480)
8. (3) Unmarked DVD-R TDK
9. Playstation 2 Power Cords and One (1) Remote Controller
10. One Black Thumb Drive Case in Plastic Bag
11. Playstation 2 Console with S/N PK135399177; Three (3) Playstation 2 Memory Cards, One with "CF" Marking, One with "AW" Marking, and One Blank
12. One White Toshiba Laptop S/N: 99039178W
13. One Tascam DR-07 Portable Digital Recorder
14. Samsung Tablet Model GT-P6800 S/N-RF1C42STA7T
15. One Black Hard Drive Serial # WX61EC67ZZME
16. 14 Computer Discs
17. Samsung Galaxy Note 3
18. One Black iPod with Two Stickers
19. One Black 30 GB iPod
20. HP Laptop, Silver Colored 5CG73912H3
21. One Black HP Laptop S/N: 2CE3141VFR, Product: C2L4OUA#ABA
22. One Black Toshiba Laptop S/N: Y9190958Q
23. SIM Card
24. One Sony IC Recorder
25. iPhone, Black Color
26. One iPhone With Black Otter Case PW-030240
27. Toshiba USB 2.0 External Hard Drive and Cord
28. 256 MB Sandisk Memory Card
29. San Disk Memory Stick Flash Drive 32 GB Cruzer Glide
30. "1" Samsung Tablet, Black w/ T-Mobile C060 S/N: RF2F701KEVE
31. One Black Hard Drive
32. File System Image of iPhone Item (from "One iPhone with Black Otter Case PW-030240")
33. Physical Image of Samsung Phone (from "Samsung Galaxy Note 3")
34. Nintendo Game Cube, S/N DS311890857; Two (2) Game Cube Remote Controllers, One (1) Game Cube Memory Card and Cables

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

All information that constitutes fruits, evidence and instrumentalities of violations of 18

U.S.C. §§ 2252 and 2252A ("SUBJECT FILES") including, without limitation, information

pertaining to the following matters:

a. Child pornography and child erotica;

b. Evidence of who uploaded, owned, controlled, or otherwise used the SUBJECT FILES;

c. Evidence of when, and under what circumstances the SUBJECT FILES were uploaded, downloaded, created, modified, deleted, accessed, or shared;

d. Evidence relating to the mental state of the uploader of the SUBJECT FILES as it relates to the crimes under investigation.

e. Stored photographs, videos or any images of minors engaged in sexually explicit conduct;

f. Any hidden, deleted or erased data, communications, photographs or graphic images, multimedia items or documents found in the DEVICES which constitute evidence of the offenses listed above;

g. Stored electronic mail, including attachments, MMS messages, and voice messages and other recordings which may pertain to sexual conduct with minors or attempts to meet with minors;

h. Evidence of who used, owned, or controlled the DEVICES at the time the things described in this warrant were created, received, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

i. Evidence of the times the DEVICES were used;

j. Passwords, encryption keys, and other access devices that may be necessary to access the DEVICES;

2

k.  Contextual information necessary to understand the evidence described in this attachment;

l.  Records of internet activity, including but not limited to caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

**ATTACHMENT C**

4



IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:17-mj-621 |
| SEAN ANDREW DUNCAN | |
| Defendant. | |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Special Agent Katherine Campo, being first duly sworn, hereby depose and state as follows:

1.      I am a Special Agent of the Federal Bureau of Investigation (hereinafter FBI), assigned to the Washington Field Office, Joint Terrorism Task Force (JTTF). I have been an FBI Special Agent since 2017. As part of my duties, I investigate terrorist activities associated with Homegrown Violent Extremists (HVE). I have participated in counterterrorism investigations, during the course of which I have executed court authorized search warrants, and used other investigative techniques to secure relevant information regarding various crimes.

2.      I submit this affidavit in support of a criminal complaint for Sean Andrew Duncan for knowingly altering, destroying, mutilating, and concealing tangible objects, that is, a thumb drive and memory chip, with the intent to impede and obstruct the investigation of a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI"), a department or agency of the United States, in violation of Title 18, United States Code, Section 1519.

3.      This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter

observed by me or known to the government.  The facts in this affidavit come from my personal

observations, my training and experience, and information obtained from other agents, law

enforcement officers and witnesses.  This affidavit is intended to show merely that there is

sufficient probable cause for the requested warrants and does not set forth all of my knowledge

about this matter.  When I refer in this affidavit to something occurring on a particular date, I

mean "on or about" that date.

<u>Probable Cause</u>

I.       <u>Duncan Possessed Evidence on Memory Chips and Thumb Drives</u>

5.       In February 2016, the FBI received information regarding Sean Andrew Duncan,

(hereinafter "Duncan"), a United States citizen, who moved to Sterling, Virginia in June 2017

from Pittsburgh, Pennsylvania.  One of Duncan's relatives reported that Duncan had converted to

Islam, may have been radicalized, and voiced his approval of westerners being beheaded in the

Middle East.  Duncan's relative reported that Duncan and his wife planned to travel to Turkey.

6.       On December 6, 2017, the FBI conducted a search of Twitter and found an

account associated with a phone number ending in 7730.  According to an open source review of

Twitter, the account was created in "November 2015" and has the Twitter handle

@DawlahtulIslaam.  The phrase "Dawlahtul Isla[a]m" is an Arabic phrase that roughly translates

to "The Islamic State."  According to the application for a U.S. passport that Duncan submitted

in November 2015, Duncan listed a phone number ending in 7730.

A.       <u>Travel to Turkey</u>

7.       According to U.S. Customs and Border Protection, Duncan and his wife each

booked a flight to Istanbul, Turkey, departing from Washington Dulles International Airport, on

February 26, 2016.  The reservations reflected that Duncan and his wife were scheduled to depart

2

Turkey for Bangladesh on March 4, 2016, and return to the United States on March 20, 2016. In fact, on February 26, 2016, Duncan and his wife departed the United States for Turkey. On February 27, 2016, they were denied entry into Turkey and returned to the United States. Upon their return, they were interviewed by the FBI.

8.    On March 1, 2016 - - two days after returning from Turkey and being interviewed by the FBI - - Duncan deleted his Facebook account. On or about March 2, 2016, an Internet search of a Facebook account known to belong to Duncan revealed that Duncan's account was no longer active. Two days later, Duncan changed his cellular telephone number from a number ending in 7730 to a number ending in 9440, as confirmed by the service provider.

B.  **Duncan's Contact with a Foreign Detained Citizen**

9.    On July 25, 2017, during an interview with FBI agents, an unnamed co-conspirator (hereinafter "UCC"), who was in the custody of a foreign government for actively planning to travel to join ISIS, provided information regarding Duncan.[1] According to UCC, Duncan was one of her U.S.-based contacts who had expressed an interest in joining ISIS, expressed an interest in conducting an attack in his homeland (the United States), and provided her instructions on how to construct homemade bombs. Duncan and UCC primarily spoke on encrypted mobile messaging applications. UCC also confirmed that she communicated with Duncan on a mobile messaging account ("MM1").

10.   UCC told FBI Agents she first became acquainted with Duncan on social media in or around January 2015 when Duncan sent her a friend request. UCC assessed that Duncan had come to know about her profile through a mutual friend. UCC and Duncan initially communicated through social media but subsequently exchanged phone numbers and

---

[1] UCC's statements have been independently corroborated and deemed reliable.

communicated on encrypted mobile messaging applications.

11.     According to the UCC, Duncan would share news articles with her from Amaq News[2]—an ISIS news outlet. During their communications in early 2015, Duncan expressed agreement with ISIS spokesman Abu Mohammad Al-Adnani's[3] statement that Muslims should be striking their own homelands. UCC recalled that when she asked Duncan directly if he supported ISIS, he replied that he did. In addition, UCC made it clear to Duncan from the start of their relationship in the beginning of 2015 that she would not communicate with him unless he was "pro-ISIS." UCC was looking for a "Salafi or an ISIS supporter" to marry and live with in Syria. She believed she would reap "heavenly rewards" if she married an ISIS fighter who died in battle.

12.     In or around February 2015, UCC asked Duncan if he intended to go to Syria. Duncan told UCC that he wanted to make "hijrah"[4] to Syria and that he wanted UCC to go with him to Syria. In order for Duncan and UCC to go to Syria together, Duncan proposed marriage to UCC. Duncan's proposal occurred over an encrypted mobile messaging application. Duncan told UCC that after they were married, he wanted to plan their trip to Syria. Duncan wanted to come to UCC's country to propose to UCC in person, but she said it was too soon. As a result of UCC rejecting Duncan's offer of marriage, the two broke contact in or

---

[2] Amaq News Agency is used by ISIS to spread extremist propaganda, recruitment, and to announce responsibility for ISIS-inspired attacks across the Western world and Middle East.

[3] Abu Muhammad Al-Adnani was the second-in-command of ISIS and chief propagandist of the Islamic State. Al-Adnani often incited lone-wolf terrorist attacks on the West.

[4] "Hijrah," or "migration," is a classic Islamic term for Muhammad's journey from Mecca to Medina. Hijrah is described as migrating from a non-Islamic country to an Islamic country. Hijrah is also frequently used as a term to describe an extremist's travel and resettlement to ISIS-controlled areas.

around March 2015.

13.     UCC recalled a time before they broke contact when she was upset at work due to non-Muslim women wearing shorts that exposed their bodies.  UCC told Duncan via an encrypted mobile messaging application she was upset with the way these women dressed and she wanted to do something about it.  Duncan replied with a link to a website, and a message saying she could "try this."  UCC stated that the link contained pictures and instructions on how to make weapons and bombs. UCC stated the link was to an article titled, "How to build a bomb in the kitchen of your Mom" from Inspire magazine.[5]

14.     In or around January 2016 (a month before Duncan and his wife's trip to Turkey), Duncan asked UCC if she still wanted to go to Syria and to be his second wife. UCC asked Duncan if his current wife would be okay with UCC coming with them to Syria. Duncan stated that his wife would have to be okay with it.  UCC did not agree to go, and the two broke contact again.

15.     In or around December 2016, Duncan, utilizing a mobile messaging account, re-initiated contact with UCC.  Duncan told UCC that he had come back from Turkey, where he and his wife were deported back to the United States. Duncan said he thought the FBI was monitoring him, but would not elaborate on why he was deported or why the FBI was monitoring him.  Duncan said he did not want to implicate himself and that his wife can keep secrets. Duncan stated that his wife knows what to say when questioned by authorities.  In or around July 2017, the FBI reviewed the UCC's phones and confirmed there were communications between Duncan and UCC on encrypted mobile messaging applications.

---

[5] Inspire Magazine is an online publication produced by Al Qaeda in the Arabian Peninsula.

C.    UCE #2's Interaction with Duncan

16.    On or about August 2, 2017, the FBI identified a mobile messaging account ("MM2") with a naming convention similar to the one used by UCC to communicate with Duncan ("MM1"). A review of the profile photographs for this second mobile messaging account showed a photograph of Duncan and his father. Additionally, the FBI conducted a search of Duncan's new phone number ending in 9440 in an encrypted messaging application, and uncovered that phone number was associated with MM2.

17.    On or about August 11, 2017, an FBI undercover employee (UCE #2) operating in an undercover capacity and posing as UCC, contacted Duncan, who was using MM2. UCE #2 told Duncan that "she" had been arrested by foreign authorities. Immediately after being told this, Duncan created secure chats and self-destruct timers to destroy the content of his messages with UCE #2. UCE #2 told Duncan that "she" intended to make "hijrah." Duncan stated, "Hm, you know a fence Someone to take you, and is it safe in Iraq." Later, UCE #2 asked Duncan if he had a contact in Syria, to which Duncan responded, "No a couple have been marytred (sic)."

18.    On or about August 20, 2017, UCE #2 told Duncan that "she" was in contact with an individual in Libya who was attempting to facilitate his/her travel to Libya. UCE #2 told Duncan that the Libyan contact was asking various vetting questions prior to assisting UCE #2. UCE #2 told Duncan that "her" Libyan contact was asking strange questions, such as UCE #2's blood type and family contact. UCE #2 then asked Duncan if he (Duncan) and his wife were asked similar questions when they tried to travel to Syria. Duncan stated, "they won't ask that." Duncan further stated, "I didnt (sic) go for that Just honeymoon."

19.    However, later in the conversation, UCE #2 asked Duncan what to do about "her" contact in Libya. Duncan recommended that UCE #2 ". . . lie to him." Duncan stated he had

never dealt with unnecessary vetting by "contacts" and that he had "always had referrals."
Based on my training and experience, I know that ISIS uses a referral system to recruit new
members, and I interpret Duncan's statement to mean that Duncan did not get asked questions by
his contacts because he had "referrals" who could give them "tazkiyah."[6]

### D.    Evidence from a Detained ISIS Supporter

20.    In or around October 2017, law enforcement authorities of a foreign government
arrested one of their citizens (Recruiter 1) for inciting rebellion.  Recruiter 1 is an ISIS recruiter
who is suspected of drawing foreign fighters from around the world to Recruiter 1's home
country using social media.  Recruiter 1 was married to two jihadis with connections to ISIS, one
of whom is dead and the other of whom was arrested for extremism by his home country.
Recruiter 1 posted a message on an electronic messaging application soliciting local and foreign
Muslims to help terrorists fight government troops in her home country.

21.    On or about December 4, 2017, during an interview with FBI agents, Recruiter 1
was shown a copy of approximately ten pages of handwritten names and telephone numbers
seized from her house by the foreign government law enforcement authorities.  Recruiter 1 said
she had begun recording the names and telephone numbers of individuals who had requested to
join her Telegram, Facebook, or other social media and/or communication application groups.
Recruiter 1 said each of the listed individuals had been a member of at least one of her groups at
one time.  Recruiter 1's notes included a handwritten name appearing to be "Sean Ibn Gary
Duncan," with associated phone number ending in 7730 and associated username MM1.

---

[6] Tazkiyah is a recommendation from a Ji-hadi Shaykh from their homeland or a Mujahid
already in the land of Ji-had.  It is a generally given by an existing member of ISIS to show an
individual is trustworthy.

E.   Duncan's Phone History Research to Conduct Attacks

22.     On or about June 29, 2017, the Allegheny County Police Department ("ACPD") provided a copy of Duncan's phone to the FBI.  ACPD had obtained this copy during an investigation surrounding the recent death of Duncan's infant child (the cause of death in the autopsy was inconclusive).  Duncan consented in writing to ACPD's search of his phone.  The FBI's review of Duncan's imaged phone revealed numerous internet searches for ISIS-related material, ISIS attacks, weapons, body armor, surveillance and defense tactics, and paintball venues[7] in the Pennsylvania area from in or around March 2017 to June 2017.

23.     In or around April 2016, Duncan took pictures of knives that appeared to be machetes, as well as receipts for those knives.  Based on my training and experience, I know that ISIS encourages its followers to conduct knife attacks.

24.     In or around March 2017, Duncan conducted Internet searches for home security cameras, hidden cameras, and body-worn cameras, and for "Black Flag" - - a term related to the black flag of ISIS.[8]

25.     In or around April 2017, Duncan searched for military style combat gear, bullet-proof body armor, airsoft/paintball equipment, M4 rifle magazine inserts, an instructional

---

[7] Paintball has historically been a method used by extremists to prepare for fighting overseas in support of Designated Terrorist Organizations (DTOs).

[8] The black flag is a common symbol in Islamic tradition. Historical references to black flags have been featured in Islamic hadiths prophesying the end of times when a Muslim army carrying black banners will come from Khorasan (according to Islamic tradition, geographical territory roughly equated with areas of present day Afghanistan and Pakistan). ISIS uses such prophecies to provide theological context and rationalization for their activities and world view. ISIS utilizes a black flag featuring the Islamic profession of faith or shahada. The specific flag designed and utilized by ISIS features "No god but God" in white Arabic script across the top and "Mohammad is the Messenger of God" in black Arabic script inside a white circle.

YouTube video on how to "reinforce door with a barricade," and Abu Bakr Al-Baghdadi,[9] who is the leader of ISIS. Duncan searched for bullet-proof body armor and military-style combat gear on numerous online stores and personal sales advertisements, and reviewed several instructional videos on how to wear the equipment. Duncan conducted searches for body armor that would cover his entire body, the Virginia, Maryland, and Pennsylvania laws for body armor, and he conducted a general search for "mass body armor laws." The military-style combat gear included 5.56 caliber 30-round triple magazine, battle/tactical belts, "combat" trousers, harnesses, holsters, tactical vests, plate carriers, and knee pads. Duncan appeared to have documented the particular brands of body armor within the personal notes section of his phone.

26.    On or about April 1, 2017, Duncan took video of tactical gear and a rifle carrying case that appeared to be in a firearms or military surplus store.

27.    In or around May 2017, Duncan searched for an AR15 rifle, TAC 19 pistol, information on the FBI and Department of Homeland Security, to include the personal information of a United States Customs and Immigration Service Officer, guerilla warfare, and "Manchester Attacks and Salman Abedi."[10] On or about May 5, 2017, Duncan purchased an item from evike.com, an online store that specializes in airsoft guns, to include sniper rifles and

---

[9] Abu Bakr Al-Baghdadi, named a Specially Designated Global Terrorist (SDGT) by the US Department of State, is the senior leader of ISIS and self-proclaimed Caliph of the Islamic State declared by ISIS. Al-Baghdadi has encouraged Muslims to travel to ISIS-controlled areas to fight on their behalf. More recently, Al-Baghdadi has encouraged ISIS supporters to conduct attack in their homelands. ISIS, under the direction and leadership of Al-Baghdadi, is responsible for the deaths of thousands of civilians around the world.

[10] On or about May 22, 2017, British national Salman Abedi conducted a suicide bombing at the Manchester Arena in Manchester, United Kingdom, during an Ariana Grande concert. The attack resulted in the deaths of approximately 23 individuals (including Abedi) and left over 500 individuals injured. It is believed that Abedi was in contact with ISIS members in Libya. Shortly thereafter, ISIS claimed responsibility for the attack, describing Abedi as a "soldier of the caliphate."

tactical apparel. On or about May 10, 2017, Duncan took a video of a magazine containing pictures of rifles and accessories.

28.    In or around June 2017, Duncan extensively searched for terms such as watchlist statuses leaked, watchlist terms, watchlist explanations, and known suspected terrorists.

29.    Based on my training and experience I know the above-described searches conducted by Duncan are indicative of an individual planning and researching how to conduct an attack and defend himself from severe bodily harm. The search history on Duncan's phone reveals hundreds of searches related to the above-described material between March 2017 and June 2017. Moreover, during ACPD's review of Duncan's phone and laptop in or around June 2017, ACPD discovered over 24,000 positive results after searching a list of common counterterrorism terms.

II.    <u>Search of Duncan's Residence</u>

30.    On December 19, 2017, United States Magistrate Judge Theresa Carroll Buchanan authorized a search of Duncan's residence, on Courtyard Square, in Sterling, Virginia, for evidence of attempts to provide material support to ISIS, in violation of 18 U.S.C. § 2339B, as well as false statements, in violation of 18 U.S.C. § 1001. Among the items authorized for seizure in the search were files or information (including files or information on computers or phones) involving travel or attempts to travel overseas; communications with members of foreign terrorist groups, and/or foreign or U.S.-based radicalizers or facilitators, or co-conspirators; contact lists of individuals associated with foreign terrorist groups, and/or foreign or U.S.-based radicalizers or facilitators; records of internet activity, or other information identifying support for or research related to a foreign terrorist group; and information, programs, tools or

applications that may be used for overt or clandestine/covert communications, and any associated contacts or communications history.

31.     On December 29, 2017, FBI agents executed the search warrant at Duncan's residence. Upon execution of the warrant, the agents knocked on the door, identified themselves as FBI, and announced that they were there to execute a search warrant. Receiving no response, the agents knocked and announced their presence again, but received no response again. The agents then forcibly opened the door, and again identified themselves as FBI, and that they were there to execute a search warrant. The agents at the front door did not see anyone.

32.     Moments before the FBI agents entered the residence through the front door, Duncan ran out the back door, barefoot, and with something clenched in his fist. FBI agents guarding the back door yelled at Duncan to stop. Before stopping, Duncan threw a plastic baggie over the heads of the agents.

33.     FBI agents recovered the baggie thrown by Duncan. The baggie was a clear plastic Ziploc bag, containing a memory chip stored within a thumb drive that had been snapped into pieces, and placed in a liquid substance that produced frothy white bubbles.

34.     Upon searching Duncan, agents recovered a broken casing for a thumb drive from Duncan's pants pocket.

35.     Based on my training and experience, I know that thumb drives can be plugged into computers and used to store large gigabyte amounts of electronic information, to include images and documents. Based on my training and experience, I know that criminals often use thumb drives to store evidence of their criminal activity that they do not want found on their computers.

11

36.     In light of the circumstances, I believe that Duncan fled from the house with the

baggie and the memory chip and the broken thumb drive in order to conceal those items from the

FBI agents that Duncan knew were about to search his house.  Further, I believe that the thumb

drive was snapped in pieces because Duncan altered, destroyed, and mutilated it in order to

impede and obstruct the FBI's investigation of him for attempting to provide material support to

terrorists.  Similarly, based on the circumstances, I believe that the memory chip was contained

in a baggie containing a liquid substance because Duncan altered, destroyed, and mutilated it in

order to impede and obstruct the FBI's investigation of him.

## Conclusion

37.     Based upon the foregoing, I submit there is probable cause to support that on

December 29, 2017, in Sterling, Virginia, Sean Andrew Duncan knowingly altered, destroyed,

mutilated, and concealed tangible objects, that is, a thumb drive and memory chip, with the

intent to impede and obstruct the investigation of a matter within the jurisdiction of the FBI, a

department or agency of the United States, in violation of Title 18, United States Code, Section

1519.

Katherine Campo
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me on December 30, 2017.

Ivan D. Davis
United States Magistrate Judge

12